FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 OCT 21  PM 4 53

STEPHAN HARRIS, CLERK
CHEYENNE

N. Joshua Dart, W.S.B. No. 7-4634
HEARTLAND PACIFIC P.C. | LAW OFFICES
Dominion Towers, South Tower
600 17th Street, Suite 2800 South
Denver, Colorado 80202-5428
(303) 495-6456 x 700
njdart@heartlandpacific.com

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF WYOMING

| | |
|---|---|
| DEBRA J. NATION,<br>EMMA D. GARVIN,<br>JEANNE L. NEEMAN,<br>JESSICA C. ESQUIBEL,<br><br>Plaintiffs;<br><br>v.<br><br>HALLADAY MOTORS, INC.,<br>a Wyoming Corporation,<br>CREDIT ACCEPTANCE CORPORATION,<br>a Michigan Corporation,<br>WARREN FEDERAL CREDIT UNION,<br>a Cooperative Association,<br><br>Defendants. | Case No. 13-CV-238 S<br>13-CV-254 S<br>13-CV-255-S<br><br><br>Plaintiffs' Original Complaint |

Each Plaintiff by and through their attorney, N. Joshua Dart, Heartland Pacific P.C., for their

complaint against Defendants state and allege as follows;

1.      This case involves a tangled web of deceit in the sale of three vehicles to the Plaintiffs, which Defendant Halladay Motors, Inc. has been given multiple opportunities to make things right in each instance, but has ultimately failed to do so.

## PARTIES

2.      Each Plaintiff, Debra J. Nation ("Ms. Nation"), Emma D. Garvin ("Miss Garvin") Jeanne L. Neeman ("Ms. Neeman") and Jessica C. Esquibel ("Miss Esquibel"), is an individual who is a citizen of the State of Wyoming.

3.      Defendant, Halladay Motors, Inc. ("Dealer"), is a corporation that is incorporated under the laws of the State of Wyoming. Dealer has its principal place of business in the State of Wyoming. Dealer may be served with process by serving its registered agent, Don W. Riske, *Esq.* at 1720 Carey Ave., Ste. 500, Cheyenne, Wyoming 82001.

4.      Defendant Credit Acceptance Corporation ("Credit Acceptance"), is a corporation that is incorporated under the laws of the State of Michigan. Credit Acceptance has its principal place of business in the State of Michigan. Credit Acceptance may be served with process by serving its registered agent, Corporation Service Company, 1821 Logan Ave., Cheyenne, Wyoming 82001.

5.      Defendant Warren Federal Credit Union ("Warren FCU") is a cooperative association organized in accordance with the provisions of the Federal Credit Union Act. 12 U.S.C. § 1751 *et sec.* Warren FCU has its principal place of business in the State of Wyoming. Warren FCU may be served with process at 114 E. 7th Avenue, Cheyenne, WY 82001.

6.      Plaintiffs anticipate the need to name one or more unknown defendant(s) as they become known through the discovery process.

## JURISDICTION

7.      The Court has jurisdiction over the lawsuit because the suit arises under the following;

8.      Magnuson-Moss Warranty Act ("MMWA") 15 U.S.C. 2301 *et sec.* The amount in controversy computed on the basis of all claims to be determined in this suit exceeds the sum of $50,000.00, and the amount in controversy of any individual claim exceeds the sum of $25.00.

9.       Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681. There is no amount in controversy requirement under the FCRA.

10.      The Court has supplemental jurisdiction under 28 U.S.C. §1367 over each plaintiff's claims of Unfair and Deceptive Trade Practices, because plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution. Defendants' violations of the MMWA and the FCRA are unfair and deceptive, each additional claim asserted is intertwined with these violations, making jurisdiction appropriate.

## VENUE

11.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Each vehicle was advertised, purchased and financed in the State of Wyoming.

## CONDITIONS PRECEDENT

12.    All conditions precedent have been performed or have occurred.

## FACTS

13.    Before the sale, Plaintiffs, Debra J. Nation ("Ms. Nation"), Emma D. Garvin ("Miss Garvin") Jeanne L. Neeman ("Ms. Neeman") and Jessica C. Esquibel ("Miss Esquibel") each saw the Dealer's advertisements on T.V., in the newspaper, and heard them on the radio.

14.    These advertisements stated that all consumers were "guaranteed credit". That representation was important to Ms. Neeman and Miss Esquibel in selecting this Dealer to purchase a vehicle from.

15.    Ms. Neeman visited Dealer's location and website on one or more occasions in search of a more economical vehicle.

16.    Ms. Neeman and Dealer signed an order ("Exhibit 1") on October 22, 2011 for the purchase of a 2006 Cadillac DTC with 79,083 miles, VIN# 1G6KD57Y76U104348, and trading in a 2008 Daimler Chrysler Sebring with 34,499 miles, VIN#1C3LC46J48N237038.

17.    During the transaction identified in ¶ 16, Dealer employed one or more unfair and deceptive trade practices against Ms. Neeman (who is more than 60 years old) in violation of the Wyoming Consumer Protection Act. W.S. 40-12-101 *et sec.*

18.    The transaction identified in ¶ 16 included the use of a method to victimize an older person and Dealer knew or should have known that its conduct was unfair and or deceptive.

19.    Miss Garvin and Ms. Nation (collectively "Garvin/Nation") browsed Dealer's location

and website on one or more occasions with no intention on purchasing a vehicle, as the Kia they

owned was paid off.

20.    Garvin/Nation received a contest notice from Dealer in the Mail and they visited Dealer

for the sole purpose of claiming their prize visited on or about November 10, 2011.

21.    Garvin/Nation signed paperwork that included what they later learned was a purported

order ("Exhibit 2") for the purchase of a 2005 Ford Escape with 127,843

miles,VIN#1FMCU93195KC73245, and purportedly trading in a 2008 Kia Rio with 51,709 miles,

VIN#KNADE123786317974.

22.    During the purported transaction identified in ¶ 21, Dealer employed one or more unfair

and deceptive trade practices against Miss Garvin (who is a person with disabilities) and Ms.

Nation (who is a person with disabilities) in violation of the Wyoming Consumer Protection Act.

W.S. 40-12-101 *et sec.*

23.    The purported transaction identified in ¶ 21 included the use of a method to victimize a

person with disabilities and Dealer knew or should have known that its conduct was unfair and or

deceptive.

24.    Miss Esquibel visited many dealers in Cheyenne, Wyoming shopping for an affordable

vehicle that was safe for her as an expectant mother and her son.

25.    Miss Esquibel visited Dealer on several occasions, and on August 28, 2012 Miss Esquibel

and Dealer signed an order ("Exhibit 3") for the purchase of a 2007 Buick Lucerne with 96,424

miles, VIN#1G4HP57297U214342.

26.    During the transaction identified in ¶ 25, Dealer employed one or more unfair and

deceptive trade practices against Miss Esquibel (who was pregnant at the time) in violation of the

Wyoming Consumer Protection Act ("WCPA"). W.S. 40-12-101 *et sec.*

27.    Upon arrival at the Dealer on the dates indicated above, each Plaintiff was soon contacted

by its "Salesperson of the Year" Samer Ibraham ("Sam") whose business card indicates that he

is a "Special Finance Manager & Senior Sales Associate".

28.    After making contact with each Plaintiff, Sam ushered them inside and presented them

with paperwork.

## MS. NEEMAN (OCTOBER 22, 2011)

29.    Ms. Neeman did not authorize Sam to access her credit report. Yet on information and

belief Sam did access her credit report.

30.    Ms. Neeman recalls being presented with paperwork to sign, but was not given ample

time to carefully review the documents prior to signing them, she was told by Sam to "sign here"

as each document was presented in rapid succession.

31.    Although Ms. Neeman did not know it at the time, the paperwork she signed did *not*

include an application for credit. Ms. Neeman later became aware that an application for credit

was completed, signed, and transmitted to Warren FCU without her permission by someone at Dealer.

32.     This forgery included the false representation that Ms. Neeman's income was $2,500 per month, this false representation induced Warren FCU to approve Ms. Neeman for financing. Whomever at Dealer that forged the application for credit knew that listing Ms. Neeman's actual monthly income of $1,400 would cause Warren FCU to deny financing at terms acceptable to Ms. Neeman.

33.     On information and belief Ms. Neeman's credit score was 799 on October 22, 2011, and today is in the 400-500 range as a result of Defendant's fraudulent act.

34.     On information and belief Ms. Neeman's was charged an unfair sales price of $14,475.00 for the Cadillac, and was given an unfair trade-in allowance of $8,500.00 (when she still owed Wells Fargo $10,957.00) resulting in the amount necessary to be financed by Warren FCU of $18,145.00.

35.     During the transaction Ms. Neeman was told by Sam that the Cadillac was "in excellent condition", "really safe car for you and your son" and he joked that it was a car for "old people". None of these representations were written into the sales paperwork and that was unfair to Ms. Neeman.

36.     By May 31, 2012 Ms. Neeman was struggling to pay all of her bills so she went in to the Dell Range location of Warren FCU. She opened a checking account with an unknown female Warren FCU employee.

37.     Ms. Neeman described to the employee how she had told Sam at Dealer she could only afford monthly payments of $250.00 yet when the dust settled and she had a chance to review the loan paperwork, the payments were $299.00 per month.

38.     The Warren FCU employee accessed the electronic records for the transaction and told Ms. Neeman they put your income down as $2,500.00. Ms. Neeman was shocked to learn of this, and immediately felt that there must have been fraud on the part of Dealer.

39.     The Warren FCU employee proceeded to tell Ms. Neeman that "she may have just signed something in the pile of papers", "that she had to get rid of that car", "that she needed to stop paying her Credit Cards" and when asked by Ms. Neeman what could be done to modify the loan "there is nothing we can do". This conduct of Warren FCU had the effect of the ratification of the fraud perpetrated on Ms. Neeman by Dealer.

## MISS GARVIN/MS. NATION (NOVEMBER 10, 2011)

40.     Miss Garvin and Ms. Nation remember being presented with paperwork to sign, but they each thought it was related to the contest. The women were not given ample time to carefully review the documents prior to signing them, they were each told by Sam to "sign here" as each document was presented in rapid succession.

41.     Permission was never given to Sam to check their credit because neither of the women where interested in purchasing a vehicle. On information and belief Sam did access a credit report for each of them.

42.  At some point Sam told Garvin/Nation "I'll find you a loan" upon hearing this Ms.

Nation told Miss Garvin that no one would ever approve a loan for them, as they had zero credit

and relied upon Per Capita payments from their Tribe, as well as social security disability.

43.  At some point Sam asked Miss Garvin to give him the keys to the Kia Rio. She thought

maybe it was part of the contest or that the car was going to be washed. Confused about the

purpose for handing over the keys, she complied.

44.  On information and belief, while Garvin/Nation were sitting in Sam's office, an employee

of Dealer drove a Ford Escape and left it idling directly behind their Kia Rio, blocking them in.

45.  After telling Plaintiffs that they needed to return home to retrieve additional

documentation of income and the title to the Kia, Sam handed Plaintiffs the keys to the Ford

Escape. Miss Garvin stated that those keys were not theirs, to which Sam replied that they were

to drive the Ford Escape home.

46.  Due to their disabilities that substantially limits major life activities and requires Ms.

Nation to seek the services of a payee, and the unfair and deceptive sales tactics employed by

Sam, Garvin/Nation became very confused and embarrassed. Since their Kia was blocked in,

they left Dealer in what they understood to be a "loaner" vehicle in order to go home and

retrieve additional documentation.

47.  On information and belief Garvin/Nation were charged an unfair sales price of

$10,025.00 for the Ford, and were given an unfair trade-in allowance of $3,425.00 resulting in the

amount necessary to be financed by Credit Acceptance of $8468.00.

## MISS ESQUIBEL (AUGUST 28, 2012)

48.     On a prior visit, Miss Esquibel asked Sam about purchasing a 1999 Dodge Neon with a

window sticker of approx. $5000. Sam told her "Credit Acceptance does not allow financing on

vehicles that old." Sam knew, and Miss Esquibel did not know that this statement was

completely false. Miss Esquibel relied upon this false and deceptive statement in selecting a more

expensive vehicle the Buick Lucerne.

49.     Miss Esquibel test drove and fell in love with the Buick. When she asked Sam about some

visible damage on the passenger side fender and what appeared to her to be minor damage all

over the car Sam told her that the previous owner "had hit a deer".

50.     Sam and/or Dealer, knew or should have known that on 07/12/2011, the Buick that Sam

was showing to Miss Esquibel was declared a total loss due to hail damage. Instead Sam told Miss

Esquibel that it was "a good reliable car" and that beyond the fender damage the car was in

"perfect condition".

51.     Upon information and belief Dealer is a "Carfax Advantage™ Dealer". Which according

to the April 4, 2011 press release issued by Carfax, Inc. "distinguishes Carfax subscribing dealers

that are committed to transparency. Through the program, participating dealers can set

themselves apart from their competition. Used car shoppers know they can buy with greater

confidence when shopping at any Carfax Advantage dealership."

52.     On information and belief, despite having unlimited access to Carfax reports, neither Sam

nor Dealer presented Miss Esquibel with a Carfax report. This failure to access a Carfax report

would appear to indicate that Dealer as an expert in used car values was afraid of what the Carfax

for that particular vehicle would reveal, making it much more difficult to sell.

53.     Miss Esquibel completed some paperwork for the purchase and put down $200.00 to

hold the Buick.

54.     On August 28, 2012 Miss Esquibel again met with Sam as she had made payments each

payday and had the final amount needed to have a down payment of $1,100.00 for the Buick.

55.     Sam's assistant presented paperwork to Miss Esquibel and her mother for their review.

Miss Esquibel reviewed and then signed each document. Upon information and belief, no

document indicated any damage to the vehicle whatsoever.

56.     On information and belief Miss Esquibel was charged an unfair sales price of $7,900.00

for the Buick, because it had been deemed a total loss due to hail damage, had other visible

damage to the passenger side fender, resulting in the amount necessary to be financed by Credit

Acceptance of $9,171.00.

57.     Subsequently, Miss Esquibel had to make a claim under her insurance for an accident that

occurred in December 2012. Because the insurance adjuster discovered the report of a total loss

on the vehicle history, the amount Miss Esquibel was reimbursed was far less than it would have

been for a vehicle that was in the condition described to her at the time of the purchase.

## FIRST CLAIM: WYOMING CONSUMER PROTECTION ACT

58.     Each Plaintiff incorporates by reference all previous paragraphs as if set out here in full.

59.    This first claim is for violation of the Wyoming Consumer Protection Act. W.S. § 40-12-101 *et sec.* by the Dealer and for which both Credit Acceptance and Warren FCU (collectively "Financier") are derivatively liable by operation of law[1] and by the express terms of the contract between the parties.

60.    At all times relevant, Plaintiffs were each a consumer.

61.    At all times relevant, the Dealer did business as Halladay Motors, Inc., and was and is a corporation and a supplier and merchant, and in the business of selling and arranging for the financing of agreements relating to the sale of motor vehicles, and rendering advice and counsel to consumers with regard to and in relation to same, all within the jurisdiction of this Court.

62.    At all times relevant, Defendant Credit Acceptance was and is a corporation and financing agency, engaged in the business of financing the sale of motor vehicles to Wyoming consumers for said consumers' personal use, and was a creditor doing business within the jurisdiction of this Court.

63.    At all times relevant, Defendant Warren FCU was and is a Cooperative Association and financing agency, engaged in the business of financing the sale of motor vehicles to Wyoming

---

[1] On information and belief, each retail instalment contract which the financier holds, and under which the Plaintiffs make their monthly payments to the financier, contains the following term: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." This term makes the financier also liable for Plaintiffs' damages.

consumers for said consumers' personal use, and was a creditor doing business within the

jurisdiction of this Court.

64.     The retail instalment contract between Plaintiffs and the Dealer was assigned to the

Financier. As a result, the Financier "stands in the shoes" of the Dealer for all legal purposes.

Plaintiffs' obligation to pay the Financier under the contract between them is subject to all claims

and defenses which Plaintiffs have against the Dealer, as are alleged more specifically below, and

defendant Financier is not a holder in due course of any instrument signed by Plaintiffs.

65.     Defendant Dealer is a motor vehicle dealer obligated to deal with Plaintiffs in good faith in

all respects.

66.     On the dates indicated above each parties entered into a consumer transaction, in that

Plaintiffs agreed to purchase a certain motor vehicle from the Dealer and the Dealer agreed to sell

that vehicle to Plaintiffs on an instalment payment basis, and as part of the deal the Dealer agreed

to extend credit to Plaintiffs and to finance the sale of the vehicle itself and did also subsequently

arrange for the Financier to extend credit to Plaintiffs.

67.     As part of each deal, the Dealer made representations to Plaintiffs and Plaintiffs relied

upon the truthfulness of all said representations.

68.     As part of each deal, the Dealer represented to Plaintiffs as indicated above, and Plaintiffs

relied on said representations. Each representation was important to each Plaintiffs in deciding to

acquire the vehicle they had selected, but upon information and belief were not written into the

sales documents, contrary to the requirements of the law.

69.    As part of each deal, and by operation of law, the Dealer also gave to Plaintiffs an implied

warranty of merchantability and fitness for use, even though in other paperwork the Dealer

attempted to disclaim or otherwise limit the implied warranties that it had given to Plaintiffs,

which was unfair and deceptive to Plaintiffs and in violation of the law.

70.    Each motor vehicle involved in each transaction as indicated above are goods.

71.    Defendant Dealer knew that Ms. Neeman would not have been approved by Warren FCU

if her paperwork indicated her true income. Being approved at an affordable payment was

important in her decision to acquire the vehicle, and the fact that she could not be approved for

the vehicle she had selected should have been disclosed to Ms. Neeman on or before the date of

sale, but Dealer did not do so.

72.    Defendant Dealer knew or should have known that Garvin/Nation were not in the

dealership to purchase a vehicle, and lacked sufficient income to make payments, the fact that

they were "approved" confused Garvin/Nation who never had a meeting of the minds with

Dealer.

73.    Defendant Dealer knew or should have known that the prior damage and repairs to the

Buick Lucerne sold to Miss Esquibel existed and that those facts would be important to her in

making her decision to acquire the vehicle, and that it should have been disclosed to Plaintiffs on

or before the date of sale, but it did not do so.

22. As a result of the above facts and others yet to be discovered and plead, each Plaintiff requested that the Dealer cancel the transaction and refund Plaintiffs' money, but the Dealer refused and that was unfair to Plaintiffs.

74.    As a result of the above facts before, during or after a consumer transaction between each Plaintiff and defendant Dealer, the Dealer committed one or more unfair, deceptive and unconscionable acts in violation of W.S. § 40-12-105.

75.    During the course of the consumer transaction between the Dealer and each Plaintiff, the Dealer provided conflicting notices of warranty rights and warranties to Plaintiffs and that was unfair to Plaintiffs.

76.    Although federal law required the Dealer to disclose in writing to Plaintiffs whether its warranty to Plaintiffs was a full warranty or a limited warranty , the Dealer failed to disclose either and, thus, by operation of law the dealer's warranty to Plaintiffs is a full warranty under the law.

77.    As a result of the above facts, Defendant represented to each Plaintiffs that the subject of a consumer transaction had benefits that it did not have and representing that the subject vehicle was a particular standard, quality, or grade that it was not.

78.    As a result of the above facts, before, during or after a consumer transaction between each Plaintiff and Defendant Dealer, Defendant Dealer committed an unconscionable act or practice for which the Financier is derivatively liable in connection with a consumer transaction, in that it

knowingly made, at the time the consumer transaction was entered into with Plaintiffs, a

misleading statement of opinion on which each Plaintiff was likely to rely to their detriment.

79.     As a result of the above facts, the defendant Dealer breached its warranties and

representations to each Plaintiffs and that was unfair, deceptive and unconscionable to each

Plaintiff, and defendant Financier is subject to all claims and defenses which Plaintiffs may assert

against the Dealer and is therefore derivatively and secondarily liable to Plaintiffs for the liability

of the Dealer.

80.     One or more of the representations the Dealer made to each Plaintiffs were both material

and false at the time they were given to Plaintiffs and the Dealer knew or should have known they

were false at the time they were made, and that was unfair and deceptive and unconscionable to

each Plaintiff.

81.     Before, during and/or after each sale, the Dealer made representations to each Plaintiff

which created in the mind of Plaintiffs, who was a reasonable consumer, a false impression as to

one or more material aspects of the deal and that was unfair to each Plaintiff.

82.     Before, during and/or after each sale, the Dealer failed to integrate into a written sales

contract all material statements, representations or promises, oral or written, made prior to

obtaining the Plaintiffs' signature on the written contract with the Dealer.

83.     The Defendant Dealer had notices of the breaches of the agreement within a reasonable

time and a reasonable opportunity to cure its breach but failed to do so and that was unfair to

each Plaintiff.

84.    The Defendant Dealer refused to honor each Plaintiffs' rescission of the transaction and that was unfair to each Plaintiff.

85.    Plaintiffs suffered and shall continue to suffer actual, incidental and consequential damages as a direct and proximate result of the inability or other failure of Defendant Dealer's failure, refusal or other inability to cure the breach and for which the Financier is derivatively liable.

## SECOND CLAIM: FTC USED CAR WINDOW STICKER RULE

86.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.       ·

87.    This second claim is for violations of the FTC Used Car Window Sticker Rule (16 C.F.R. 455.1 *et seq.* and additional violations of the WCPA by the Dealer and for which the Financier is derivatively liable.

88.    On information and belief, before, during or after a consumer transaction between each parties, the Dealer failed to properly fill out and post on each subject vehicle, and later deliver a copy of to each Plaintiffs, a Buyers Guide form that complied with applicable law and that was unfair to Plaintiffs.

89.    At all times relevant, the motor vehicle the Defendant Dealer sold each Plaintiff was a vehicle and a used vehicle, said defendant was a Dealer, and each Plaintiff was a consumer.

90.    In each instance described above, Defendant Dealer sold or offered for sale a used vehicle in or affecting commerce, as commerce is defined in the Federal Trade Commission Act.

91.     Defendant Dealer entered into a consumer transaction with each Plaintiff and at that time sold or offered for sale a used vehicle in or affecting commerce, as commerce is defined in the Federal Trade Commission Act, and upon information and belief at each time failed to have properly posted on the subject vehicle a "window sticker" form, a.k.a. a "Buyers Guide" form, that complied with the FTC Used Car Window Sticker Rule.

92.     Defendant Dealer entered into a consumer transaction with each Plaintiffs and at that time said Dealer offered a used vehicle for sale to each consumer-Plaintiffs without preparing, filling in as applicable and displaying on that vehicle a "Buyer's Guide" in the form and manner required by law for its display and use.

93.     At the time the Defendant Dealer dealt with Plaintiffs, it knew or should have known that its forms did not comply with the applicable law.

94.     As a result of the above, among other things, the Dealer has committed an unfair and/or deceptive act or practice in connection with a consumer transaction.

95.     As a result of the above, inter alia, the Defendant Dealer committed an unfair or deceptive act or practice in violation of the FTC's Used Car Window Sticker Rule and the WCPA and for which the Financier is derivatively liable.

96.     As a result of the above, inter alia, the Defendant Dealer committed one or more unfair or deceptive acts or practices in violation of the WCPA, before, during or after one or more consumer transactions between each Plaintiff and one or more of the Defendants.

## THIRD CLAIM: FEDERAL PRIVACY LAWS

97.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

98.    This third claim is for violations of the federal Privacy Laws and Regulations (15 USC 6801 *et seq.* and 16 CFR 313 *et seq.*) and additional violations of the WCPA by the Dealer and for which the Financier is derivatively liable.

99.    At all times relevant, each Plaintiff was a customer and a consumer in relation to the Dealer, and the Dealer was a financial institution, and the parties were engaged in a customer relationship, all in relation to the transaction between them and within the meaning of 15 USC 6801 *et seq.*

100.    The Financier is not an affiliate of the Dealer and the Dealer is not an affiliate of the Financier, and each was a nonaffiliated third party with respect to the other, all within the meaning of 15 USC 6801 *et seq.*

101.    Before, during or after each consumer transaction between the Dealer and each Plaintiff, the Dealer disclosed customer information about each Plaintiff, including nonpublic personal information about each Plaintiffs, to the Financier.

102.    Plaintiffs believe that the Dealer has done exactly the same thing in hundreds of other consumer transactions in the last two years with other similarly situated customers and consumers whose Dealer retail instalment sales contract was assigned to the named Financier herein and other financial institutions who were nonaffiliated third parties.

103.   Upon information and belief, before, during and after a consumer transaction between the

Dealer and each Plaintiff, the Dealer provided each Plaintiff with a "Privacy Notice" in an

attempt to comply with applicable federal Privacy Laws and Regulations, but the form fails to

comply with the requirements of the law in one or more manners.

104.   Plaintiffs believe that the Dealer has done exactly the same thing in hundreds of other

consumer transactions in the last two years with other similarly situated customers and

consumers.

105.   Upon information and belief, Defendant Dealer used the identical "Privacy Notice" form

in numerous other consumer transactions for the sale of motor vehicles and thereby violated the

applicable laws in numerous other transactions with other consumers, many of whom are

unaware of the violation.

106.   Upon information and belief, at the time the Defendant Dealer dealt with each Plaintiff, it

knew or should have known that its form did not comply with the applicable law.

107.   At the time the Defendant Dealer dealt with other consumers in the sale of motor

vehicles, it knew or should have known that its form did not comply with the applicable law.

108.   Before, during or after each consumer transaction between the Dealer and each Plaintiff,

the Dealer failed to comply in one or more manners with its statutory and other obligations and

duties under 15 USC 6801 *et seq* and one or more of its enabling provisions of the Code of Federal

Regulations, and that was unfair and deceptive to Plaintiffs.

## FOURTH CLAIM: BREACH OF CONTRACT

109.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

110.    This fourth claim is for breach of contract and/or warranties and additional violations of the WCPA by each and every defendant, jointly and/or severally.

111.    As a result of the above, inter alia, each and every defendant breached its contract and warranties with Plaintiffs, and that was unfair and/or deceptive to Plaintiffs.

## FIFTH CLAIM: MAGNUSON MOSS ACT

112.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

113.    This fifth claim is for violation of the Magnuson Moss Warranty Act (15 U.S.C. 2301 *et seq.*) and for additional violations of the WCPA by the Dealer and for which the Financier is derivatively liable.

114.    Before, during or after each consumer transaction between the parties, the Dealer failed to comply with the terms of its warranty in one or more manners, and that was unfair to each Plaintiff.

115.    Before, during or after each consumer transaction between the parties, the Dealer failed to comply with its statutory and other obligations under the Magnuson Moss Act, and that was unfair to each Plaintiff.

116.    As a result of the above, inter alia, the Dealer violated the Magnuson Moss Act and that was unfair and/or deceptive to each Plaintiff

## SIXTH CLAIM: FRAUD

117.    The allegations of all other paragraphs and claims in this pleading are incorporated as if fully rewritten herein.

118.    This sixth claim is for fraud and deceit by the Defendant Dealer for which the Financier is derivatively liable.

119.    During the course of the transaction between the Plaintiffs and the Defendant Dealer, several false representations of fact were made by the Defendant Dealer with knowledge of its falsity or with utter disregard and recklessness about its falsity that knowledge may be concluded or found, as stated above in more detail.

120.    During the course of each subject transaction between each Plaintiff and the Defendant Dealer, a knowing concealment of fact which was done by said Defendant Dealer at a time when, and under circumstances where, there was a duty to disclose, to wit: for Miss Esquibel, the truth about the condition of the vehicle and its prior damage and history and the effect that would have on the value of the vehicle, for Garvin/Nation the fact that they were purchasing a vehicle that they did not want and were unable to afford the payments, for Ms. Neeman the forgery that misrepresented to the Financier her monthly income, and all other misrepresentations stated and referred to above.

121.    The Defendant Dealer's acts and omissions of representation and concealment were material to each transaction.

122.    The Defendant Dealer's acts and omissions of representation and concealment were made with the intent of misleading each Plaintiff into relying upon it.

123.    The Defendant Dealer's acts and omissions of representation and concealment were made with the fraudulent intent of inducing each Plaintiffs to enter into a written contract to purchase the motor vehicle, which each Plaintiff did.

124.    Each Plaintiffs was justified in relying on the representation and the lack of any concealment by the Defendant Dealer and each did, in fact, so rely.

125.    As a result of the above, the Dealer committed one or more acts of fraud upon each Plaintiff and that was unfair to each Plaintiff.

126.    As a direct and proximate result of the above, each Plaintiff was injured and each injury was caused by Plaintiffs' reliance on the representation and concealment.

      **WHEREFORE**, judgment is demanded against each Defendant, jointly and severally, as deemed proper and lawful by the Court, as follows:

## PRAYER FOR RELIEF

A.      Plaintiffs are entitled to an award of attorney fees and costs under 15 U.S.C §
        1681n(a)(3) and 15 U.S.C. § 1681o(a)(2) and the WCPA.

B.      Each Plaintiff be relieved of the obligations of each contract;

C.   Each Plaintiff be awarded an amount to be determined at trial for the conduct of each

defendant;

D.   Each Plaintiff be awarded such punitive damages as this Court deems just and

equitable as punishment to Halladay Motors, Inc. and as a deterrent to others;

E.   Each Plaintiff be awarded taxable costs and interest on the judgment; and

F.   Each Plaintiffs be awarded any other and further relief as the court may deem proper.

## REQUEST FOR PLACE OF TRIAL

The Plaintiffs request trial be held in Cheyenne, Wyoming.

## DEMAND FOR JURY TRIAL

The Plaintiffs respectfully request a trial by jury.

Dated this 21st day of October , 20 13.

Respectfully submitted,

N. Joshua Dart, WSB #7-4634
Heartland Pacific P.C. | Law Offices
Dominion Towers, South Tower
600 17th Street, Suite 2800 South
Denver, Colorado 80202-5428
(303) 495-6456 x 700
njdart@heartlandpacific.com

OF COUNSEL

HEARTLAND PACIFIC P.C.

ATTORNEY IN CHARGE FOR
PLAINTIFFS, DEBRA J. NATION,
EMMA D. GARVIN, JEANNE L.
NEEMAN and JESSICA C.
ESQUIBEL